UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cr-33 |
| | ) | |
| JEREMIAH ELLIS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On January 29, 2020, a hearing was conducted to determine whether the defendant, Jeremiah Ellis, is competent to stand trial. The government called Dr. Diana S. Goldstein, a neuropsychologist, as a consulting expert. The defendant called Dr. Gillespie Wadsworth and Dr. Kristina P. Lloyd, forensic psychologists, as treating experts. Both parties offered exhibits including the recording of a telephone call made by the defendant on June 30, 2017. The court now makes the following findings of fact and conclusions of law.

*Procedural History*

1. On April 16, 2014, the defendant was charged in a 2 count indictment. Count 1 alleges an armed robbery of the First Merchants Bank. Count 2 alleges that the defendant used a firearm during the robbery.

2. On May 21, 2014, the defendant made an initial appearance before Magistrate Judge Paul R. Cherry. Counsel was appointed to represent the defendant.

3. On May 27, 2014, the defendant waived his right to a detention hearing and was ordered held without bond. Trial was set for July 28, 2014 but continued on more than one occasion.

4. On October 15, 2014, a superseding indictment was returned. The superseding indictment added Counts 3 through 6. Counts 1, 3, and 5 allege armed robberies of the First Merchants Bank, a Marathon gas station, and a Mobil gas station. Counts 2, 4, and 6 allege that the defendant used a firearm during the robberies.

5. On October 22, 2014, the defendant was arraigned on the superseding indictment, and a trial was scheduled for December 15, 2014.

6. The defendant's common law wife, Ashley Patterson, was named as a co-defendant in both indictments.

7. On December 2, 2014, the defendant, through his attorney, filed a motion requesting an examination to determine whether the defendant was competent to stand trial. That motion was granted by Judge Cherry on December 5, 2014.

8. The defendant was transferred to the Federal Medical Center in Lexington, Kentucky (FMC), and he was examined by Dr. Dia B. Boutwell, a clinical psychologist. On March 18, 2015, Dr. Boutwell issued a report and concluded that the defendant was not competent to stand trial. (Government Exhibit 1, Tab 1).

9. On April 17, 2015, Judge Cherry determined that the defendant was not competent to stand trial and remanded him for treatment pursuant to 18 U.S.C. § 4241(d)(1).

10. The defendant was transferred to the Federal Medical Center in Butner, North Carolina (Butner) for treatment. On September 23, 2015, Dr. Wadsworth issued a report stating that the defendant still was not competent to stand trial. (Government Exhibit 1, Tab 2).

11. On October 6, 2015, Judge Cherry accepted the findings of Dr. Wadsworth and ordered additional treatment for the defendant.

12. On February 2, 2016, Dr. Wadsworth again reported that the defendant was not

competent to stand trial.  (Government Exhibit 1, Tab 3).

13.  On March 1, 2016, Judge Cherry ordered additional treatment for the defendant based on the report of Dr. Wadsworth.

14.  On July 7, 2016, Judge Cherry extended the defendant's stay at Butner but scheduled a status conference for September 14, 2016 on the continued treatment of the defendant.

15.  On August 22, 2016, Dr. Wadsworth issued her third report that the defendant had not benefited from the restoration protocol and was not competent to stand trial.  (Government Exhibit 1, Tab 4).

16.  At the September 14, 2016 status conference, Judge Cherry extended the treatment of the defendant for a period not to exceed 4 months.  Another hearing was scheduled for February 16, 2017.

17.  On February 17, 2017, Dr. Wadsworth again reported that the defendant had not regained competency to stand trial.  (Government Exhibit 1, Tab 5).

18.  After Judge Cherry was reassigned to the Fort Wayne Division, the case was transferred to the undersigned magistrate judge.

19.  At the July 6, 2017 status conference, a hearing on the defendant's competency was scheduled at the request of the government.  The competency hearing was continued to permit the defendant to be examined by Dr. Goldstein.

20.  Dr. Goldstein examined the defendant on December 1 and December 5, 2017 and prepared her report on January 23, 2018.  (Government Exhibit 1, Tab 6).

21.  On February 20, 2018, the defendant, through his attorney, filed a motion requesting additional treatment for the defendant.  That motion was granted on February 21, 2018, and the defendant was returned to the Butner facility.

22. On January 11, 2019, the first report prepared by Dr. Lloyd dated December 12, 2018 was filed with the court. (Government Exhibit 1, Tab 7).

23. On February 4, 2019, an order was entered extending the defendant's commitment at Butner another 4 months.

24. On June 10, 2019, the second report prepared by Dr. Lloyd on May 10, 2019 was filed with the court. (Government Exhibit 1, Tab 8).

25. By agreement of the parties, a hearing was set to determine the competency of the defendant. After several continuances, the hearing was conducted on January 29, 2020.

*Evidentiary Hearing*

26. The defendant was evaluated at the FMC between January 9, 2015 and February 23, 2015 by Dr. Boutwell.

27. The defendant was given the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) and received the following scores:

> Verbal Comprehension Index (VCI)   –   56
>
> Perceptual Reasoning Index (PRI)   –   63
>
> Working Memory Index (WMI)   –   63
>
> Processing Speed Index (PSI)   –   56
>
> Full Scale IQ   –   53

All of these scores were in the Extremely Low range.

28. Dr. Boutwell noted that the defendant "displayed some tendency to fail easier items while performing successfully on more difficult ones." (Report, page 6).

29. Dr. Boutwell also gave the defendant the Validity Indicator Profile (VIP) to assess his efforts on the psychological testing. The results of this test were "valid." (Report, page 6).

30.  The defendant completed 9th grade, held several jobs, and lived independently prior to his arrest.  He also obtained a GED during his confinement at Butner.

31.  At the FMC, the defendant was compliant with the institution regulations, lived independently, and "navigated this rather complex institution without assistance."  (Report, page 8).

32.  In spite of the defendant's background, based on the VIP, Dr. Boutwell determined that the WAIS-IV scores were valid.

33.  The defendant reported that he began using marijuana at the age of 12 and believed that some of the joints had contained PCP.  However, the defendant had been in custody for almost 1 year when the WAIS-IV was administered and presumably without access to any controlled substances.

34.  Based on her testing and the staff evaluations of the defendant, Dr. Boutwell made the following diagnosis:

> Unspecified Schizophrenia Spectrum and Other Psychotic Disorder;
>
> Intellectual Disability (Mild Mental Retardation versus Borderline Intelligence); and
>
> Cannabis Use Disorder, Severe.

(Report, page 10).

35.  Dr. Goldstein was critical of both the testing procedures and the results contained in the Boutwell report.  First, Dr. Goldstein did not consider the VIP a valid testing device to determine the defendant's effort.  Second, she testified that any effort test should have been administered as part of a battery of tests and not by itself.

36.  Dr. Wadsworth filed 4 reports with the court and did not perform any intelligence tests on the defendant.  However, she did perform the Wide Range Achievement Test, Fourth

Edition (WRAT-4), which measured basic education skills.  The defendant performed at a 5th grade level.

37.  Dr. Lloyd filed 2 reports with the court, and neither report indicated that any intelligence tests had been performed on the defendant.

38.  Dr. Goldstein performed a battery of tests on the defendant including the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV).  She assigned an IQ of 86 which is in the Low Average range.  (Report, page 23).

39.  At the hearing, all of the witnesses agreed that the IQ level determined by Dr. Goldstein was accurate.

40.  Dr. Goldstein also testified, without contradiction, that someone can fake lower performance levels on a test but not higher ones.  In other words, the higher IQ scores had to be the accurate ones.

41.  The evidence clearly shows that the defendant was malingering when he was tested by Dr. Boutwell.  To the extent Dr. Wadsworth and Dr. Lloyd relied on the conclusions formed by Dr. Boutwell, their reliance was misplaced and their own conclusions flawed.

42.  Prior to her August 22, 2016 report, Dr. Wadsworth was presented with letters from the defendant to Patterson.  The defendant made reference to his insanity defense and being "free" in approximately 1 year.

43.  Dr. Wadsworth "acknowledged that the letters written to Ashley Patterson by Mr. Ellis raise concern that Mr. Ellis could be feigning symptoms."  However, she concluded that the defendant remained incompetent to stand trial.  (Report, page 8).

44.  Dr. Wadsworth reached this conclusion before statements were taken from a jailhouse informant in June, July, and September of 2017 and before a telephone call from the

defendant to LaSharon Melvin, Patterson's mother, on June 30, 2017.

45.   According to the jailhouse informant, the defendant admitted that he was faking a mental illness and believed that he would be released when it was determined that competency could not be restored.   The informant also claimed that the defendant coached other inmates on feigning a mental illness.

46.   In the telephone call to Melvin, the defendant explained his plan to avoid a prison sentence and reported that everything was "going well."   He predicted that he would not be found "dangerous" in a civil commitment proceeding and that he would be free in 75 days.

47.   In the telephone call, the defendant also expressed concern that Patterson was considering a plea agreement and indicated that he had rejected a plea agreement with a 45 year prison sentence.   He encouraged Melvin to tell Patterson to reject the plea agreement and follow his incompetency plan.

48.   Prior to preparing her reports, Dr. Lloyd was aware of the defendant's letters to Patterson.   She also commented that Dr. Goldstein had seen statements made by the jailhouse informant.   However, Dr. Lloyd did not indicate whether she had read the actual statements.

49.   Dr. Lloyd never addressed the comments by the defendant that a finding of incompetency would result in his release from confinement and a dismissal of the charges.

50.   The 3 witnesses remained in the courtroom for the entire hearing, so Dr. Wadsworth and Dr. Lloyd heard the recorded telephone call when it was played.

51.   On cross-examination, Dr. Wadsworth testified that she was "concerned" about the telephone call but that it did not change her opinion.

52.   Neither the defendant nor the government asked Dr. Lloyd to comment on the telephone call, so she did not explain what effect, if any, it had on her opinion.

53. The defendant had been examined by Dr. Boutwell and treated by Dr. Wadsworth before he was examined by Dr. Goldstein. Dr. Boutwell had prepared 1 report, and Dr. Wadsworth had prepared 4 reports. None of the 5 reports diagnosed the defendant with Antisocial Personality Disorder.

54. Dr. Goldstein diagnosed the defendant with an Antisocial Personality Disorder and noted that it was not classified as a mental disease in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). (Report, page 27).

55. Dr. Lloyd agreed that the defendant has an Antisocial Personality Disorder. (Reports, pages 12 and 14).

56. Both Dr. Goldstein and Dr. Lloyd agreed that an Antisocial Personality Disorder was a factor to be considered in determining whether the defendant is malingering.

57. Dr. Goldstein testified that studies have determined that 30% of the defendants in criminal cases are malingering when claiming a mental disease or defect.

58. A conspiracy theory suggests that a select few people, the Illuminati, are attempting to establish a world order and assume power. This conspiracy theory has been advanced in rap music and injects the racist element that the White members of the Illuminati intend to subjugate the Black Community. (Goldstein Report, page 32).

59. The defendant has maintained that he discovered the existence of the Illuminati, and through the FBI, the Illuminati has been attempting to silence him.

60. The defendant has collected articles and has an extensive file on the Illuminati, and he has shown these materials to Dr. Wadsworth and Dr. Lloyd.

61. The Illuminati statements are the basis of the defendant's attempts to avoid a trial on the pending charges. He has rejected a plea agreement with a 45 year sentence and has

acknowledged that he faces a potential life sentence.

62. Because of the defendant's constant references to the Illuminati, both Dr. Wadsworth and Dr. Lloyd have concluded that the defendant is delusional. This diagnosis is the basis of their conclusions that the defendant is not competent to assist in his defense.

63. The defendant is not delusional. The stated belief in the Illuminati conspiracy is a hoax being perpetrated by the defendant. His letters to Patterson and his telephone call to Melvin clearly demonstrate that the defendant believes he can avoid a lengthy prison sentence by blaming the Illuminati and that he has encouraged Patterson to adopt the same strategy.

64. At Butner, the defendant attended classes and group sessions on the criminal justice system. He even participated in a mock trial.

65. All of the experts have agreed that the defendant understands the role of the judge, jury, prosecutor, and defense attorney during a trial.

66. The experts also have agreed that the defendant understands the charges against him. However, the defendant maintains that the charges are a "false flag" filed by the Illuminati in an effort to silence him, and he denies any involvement in the charged offenses.

67. Although the defendant understands the role of a defense attorney, he refuses to cooperate with his attorney because the defendant maintains that his attorney is conspiring with the assistant U.S. Attorney to frame him.

68. All of the reports indicate that the defendant was cooperative during the testing procedures and in the courses and therapy sessions.

69. The defendant has the ability to cooperate with his attorney if he chooses to do so. The defendant's Illuminati charade has been the only reason he has not cooperated with his attorney.

70. The defendant has been administered a variety of antipsychotic drugs. The medications were discontinued either at the request of the defendant or because they were not having the desired effect.

71. Because the defendant in fact is not delusional, the medications never could have affected his behavior.

72. To the extent there is a conflict in the evidence, the conclusions of Dr. Goldstein are better reasoned and more reliable.

    a. Dr. Boutwell determined that the defendant had an extremely low IQ in spite of inconsistencies in the way he answered some questions.

    b. These concerns caused Dr. Boutwell to administer a second examination to determine the defendant's effort level. The results were within normal limits.

    c. Dr. Boutwell did not include the effort examination as part of a battery of tests.

    d. Dr. Boutwell accepted the results of the IQ test in spite of the fact the defendant had lived independently both before his arrest and while confined at the FMC.

    e. Dr. Boutwell's final diagnosis was less than definitive: Unspecified Schizophrenia Spectrum and other Psychotic Disorder.

    f. Neither Dr. Lloyd nor Dr. Goldstein concluded that the defendant was suffering from any form of Schizophrenia.

    g. Dr. Boutwell failed to diagnose the defendant's Antisocial Personality Disorder.

    h. Dr. Wadsworth relied on the test results obtained by Dr. Boutwell. In fact, she

never administered an IQ test, and did not administer an achievement test until she prepared her third report.

    i. Dr. Wadsworth was provided copies of the defendant's letters to Patterson and was present in court when the defendant's telephone call to Melvin was played. Although she was "concerned" about both, she did not change her opinion on the defendant's competency.

    j. Dr. Wadsworth also failed to diagnose the defendant's Antisocial Personality Disorder.

    k. Dr. Lloyd was provided with the statements from the jailhouse informant and was present in the court when the telephone call was played. She did not address this evidence of the defendant malingering either in her 2 reports or in her testimony at the hearing.

    l. Dr. Lloyd agreed with the IQ tests results obtained by Dr. Goldstein and the diagnosis of an Antisocial Personality Disorder.

    m. None of the medications affected the defendant's claimed delusions about the Illuminati, because, in fact, he is not delusional.

    n. The conclusions reached by Dr. Boutwell were flawed, and to the extent they were relied on by Dr. Wadsworth and Dr. Lloyd, undermine the credibility of their opinions.

73. The defendant has been malingering in an effort to avoid a trial and a potential life sentence.

*Discussion*

"Unquestionably, due process requires a defendant to be competent to stand trial."

*United States v. Andrews*, 469 F.3d 1113, 1117 (7th Cir. 2006) (quoting ***United States v. Collins***, 949 F.3d 921, 924 (7th Cir. 1991)); *see also* ***Cooper v. Oklahoma***, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process.") (internal quotation and citation omitted); ***Eddmonds v. Peters***, 93 F.3d 1307,1314 (7th Cir. 1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses."). A criminal defendant at any time after commencement of a prosecution for an offense and prior to sentencing may file a motion for a hearing to determine mental competency to stand trial. **18 U.S.C. § 4241(a).** Upon such motion:

> [T]he court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

**18 U.S.C. § 4241(a)**; *see also* ***Woods v. McBride***, 430 F.3d 813, 817 (7th Cir. 2005) ("A defendant is entitled to a hearing on his competency if a bona fide doubt arises about his ability to consult with his attorney or his understanding of the charges brought against him." (citing ***Drope v. Missouri***, 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); ***Pate v. Robinson***, 383 U.S. 375, 385, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)).

To be competent, a court must determine whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." ***Dusky v. United States***, 362 U.S. 402, 402, 80 S. Ct. 788, 789, 4 L. Ed. 2d 824 (1960); *see also* ***Woods***, 430 F.3d at 817 (7th Cir. 2005) (articulating same standard for competency); ***United States. v.***

*Jones*, 87 F.3d 954, 955 (7th Cir. 1996) (same); ***United States v. Spencer Jones***, 83 F.3d 927, 928 (7th Cir. 1996) (same). There is a presumption that a criminal defendant is mentally competent to stand trial. ***United States v. Teague***, 956 F.2d 1427, 1431 (7th Cir. 1992). However, once the issue of a defendant's mental competency is raised, the government bears the burden of proving by a preponderance of the evidence that the defendant is competent to stand trial. ***Teague***, 956 F.2d at 1432 n.10; ***United States ex rel. S.E.C. v. Billingsley***, 766 F.2d 1015, 1023-24 n. 10 (7th Cir. 1985).

Dr. Boutwell failed to detect that the defendant is malingering, and her report was relied upon by Dr. Wadsworth and Dr. Lloyd. Excluding the defendant's claimed delusions about the Illuminati, all of the experts have concluded that the defendant understands the nature of the charges against him and the roles of the judge, jury, prosecutor, and defense attorney. If he chooses, the defendant is competent to assist in his defense.

The government has demonstrated by preponderance of the evidence that the defendant, Jeremiah Ellis, is competent to stand trial.

A separate order will be issued setting a trial date.

ENTERED this 20th day of February, 2020.

/s/ Andrew P. Rodovich
United States Magistrate Judge